**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GABRIEL MCMORLAND, | |
| Plaintiff, | |
| v. | Case No. 2:24-cv-00539 |
| VF CORPORATION, | |
| Defendant. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Gabriel McMorland, by and through her undersigned counsel, seeks a permanent injunction requiring a change in VF Corporation's ("Defendant") corporate policies to cause its online store to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

**GENERAL BACKGROUND**

1.      This lawsuit is calculated to enforce Gabriel McMorland's right to access the goods and information offered on Defendant's website: https://www.vans.com/en-us.

2.      Gabriel McMorland ("McMorland," "Plaintiff" or "she/her") has been a social justice advocate for most of her adult life.

3.      She is the former Executive Director of the Thomas Merton Center, a well-known Pittsburgh-based advocacy organization which describes its mission as follows:

> The Thomas Merton Center works to build and support collaborative movements that empower marginalized populations to advance collective liberation from oppressive systems.[1]

---

[1] https://www.thomasmertoncenter.org/mission, last visited Apr. 10, 2024.

4.      Among the specific advocacy goals of the Thomas Merton Center is: "Ensuring accessibility for every interested participant." *Id.*

5.      Prior to joining the Merton Center, McMorland was a digital accessibility consultant for the University of Pittsburgh as well as an accessible arts consultant for the Carnegie Museums of Pittsburgh.

6.      In addition, McMorland previously served as a task force member on the Pittsburgh/Allegheny County City-County Task Force on Disabilities and as a member of the City of Pittsburgh Commission on Human Relations and is a board member for Pittsburghers for Public Transit.

7.      When she was in college, Plaintiff began to lose her vision as the result of an unexpected genetic mutation, and she has been legally blind since 2001 and does not have the visual ability to read or perceive images.

8.      As a result of her personal and professional background, McMorland is uniquely positioned to recognize that evolving digital technologies present an unprecedented opportunity for the vision impaired community to have increased independent access to goods and services – so long as those technologies are, in fact, accessible.

9.      The National Federation of the Blind has highlighted this fact as follows:

Individuals with disabilities often rely on websites to overcome the systemic transportation, communication, architectural, and other barriers that pervade our society.  A blind person can review and save coupons using a website that would have otherwise required a sighted assistant. A deaf or hard-of-hearing person can participate in a conversation through a Web-based platform more freely than they would be able to in person.  Many autistic people can more independently review information about a store's offerings online.  And the 24-hour-a-day availability of information and transactions on websites provides a level of independence and convenience that cannot be replicated through any other means.

The lack of accessible websites has far reaching effects on virtually every aspect of the lives of individuals with disabilities . . . .

*See* Amicus Brief filed on behalf of the National Federation of the Blind, et al., in *Winn-Dixie Stores, Inc. v. Juan Carlos Gil*, Case No. 17-13467 (11th Cir. Dec. 20, 2017).

10.     To access websites, McMorland uses screen reader software, which "translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein):

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.*; *See also* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed Apr. 10, 2024) (discussing screen readers and how they work).

11.     McMorland is an experienced and highly competent user of screen reader software.

12.     She is aware of the Department of Justice's longstanding position that the Americans with Disabilities Act ("ADA") requires that websites be accessible to individuals with vision impairments.

13.     Based upon her personal experiences and knowledge, McMorland is also aware that a significant percentage of websites that offer goods and services to the public have material access barriers which limit or altogether prevent a vision-impaired individual's access to the websites.

14.    McMorland believes that the importance of accessible technologies to her personally and to the vision-impaired community generally was amplified during the recent pandemic.  She believes that as the world becomes more dependent upon digital technology and takes a permanent step away from brick-and-mortar businesses, the vision-impaired community risks being left behind.

15.    To ensure her continued access to goods and services in the digital economy, McMorland has filed this lawsuit (and other similar lawsuits) calculated to enforce her federal rights under the ADA.

16.    In this lawsuit and in other similar cases, McMorland would never agree to a resolution unless it included material improvements to accessibility and ongoing monitoring by her counsel to ensure that those improvements are implemented and maintained.

## ACCESSIBILITY BARRIERS ON DEFENDANT'S WEBSITE

17.    Defendant sells shoes, clothing, and accessories on its website.

18.    Defendant is responsible for the policies, practices and procedures concerning the website's development, maintenance and content.

19.    Within the relevant limitation period, Plaintiff attempted to access Defendant's website using the JAWS auxiliary aid on her computer.

20.    Defendant's website was unusable by Plaintiff as a result of myriad access barriers. The following detailed examples of these barriers include:

   a.    The website's header has menus, such as "new" and "shoes". Buttons below these menus are labeled "open new submenu" and "open shoes submenu", respectively. Plaintiff found that activating these buttons did not open a submenu or have any other effect;

b.  Multiple graphics on the website's homepage lack meaningful labels. Where graphics have accurate and descriptive labels, Plaintiff and other screen reader users can independently ascertain the purposes of such labels. Plaintiff encountered the following labels on the website's homepage:

> https://images.vans.com/is/image/Vans/VN000EYE_BWW_HERO?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN000EYE_X1L_HERO?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN000CN1_R2S_HERO?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN0A7Q5R_TYQ_HERO?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN000GA5_1KP_ALT4?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN000BVZ_CJL_HERO?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN000EYE_BPJ_HERO%20?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN0A5I1K_705_HERO?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/Vans/VN0A5I1K_705_HERO?wid=600&qlt=70 Link Graphic
>
> https://images.vans.com/is/image/VansBrand/SP24%5FSpringEssentials%5FHP%5FSecondary%5FApparel%5Fm%5F398x498?$fullres$ Link Graphic
>
> IFE Image 5 Mobiel Link Graphic

These labels do not meaningfully convey the content or purpose of their respective graphics;

c.  At https://www.vans.com/en-us/shoes-c00081, the website indicates the original and sale prices of items using strikethrough text.



Checkerboard La Costa Slide-On Sandal
$37.00  $24.95

Toddler Slip-On V Shoe
$38.00  $29.95

Screen reader software does not distinguish between struck-through and standard text, meaning screen reader users focusing on these items will not hear a indication of the significance of the two prices;

d.  At  https://www.vans.com/en-us/shoes-c00081/classic-slip-on-checkerboard-shoe-pvn000eyebpj, shoppers can purchase Defendant's Classic Slip-On Checkerboard Shoe in regular and wide sizes. Shoppers select their desired width using buttons labeled "Regular" and "Wide."



Plaintiff found that she was able unable to use these elements with JAWS, the screen reader software that she uses personally and professionally. She was able to use these buttons by switching to Narrator, a screen reader software that she does not regularly use, but that doing so caused her screen reader's focus to jump to the top of the webpage without warning. This is a frustrating, disorienting experience for screen reader users, as they must then navigate back to the point from which their focus jumped;

e.   Similarly, Plaintiff found that she could not access the size selection buttons on the same page using JAWS. Again, she could access them with Narrator, but a selection caused her screen reader's focus to jump to the top of the webpage without warning; and

f.   On the same webpage, sighted users will be able to confirm their width and size selections, because the background of such selection will shift from white to black. Plaintiff heard no equivalent confirmation when focusing on these selection buttons.

21.    Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., *Ensuring Digital Accessibility Through Process and Policy 140* (2015). As one leading commentator notes,

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Website under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2, 1/13/16).

22.    To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic

basis using both automated accessibility screening tools and end user testing by disabled individuals.

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.

> Something you imagine you may need to do, you may not need to do at all or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

23.    Against the above backdrop, Plaintiff files this Complaint to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

## JURISDICTION AND VENUE

24.    The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

25.    Defendant participates in the Commonwealth's economic life by clearly performing business over the Internet. Through its website, Defendant enters into contracts for the sale of its products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You*, Order, ECF No. 123 (W.D. Pa Apr. 25, 2017) *clarified by* Order of Court, ECF No. 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *see also Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (same); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

26.    As described in additional detail below, Plaintiff has been injured when she attempted to access Defendant's website from this District but encountered barriers that denied her full and equal access to Defendant's online goods and content.

27.    Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

28.    Plaintiff is and, at all times relevant hereto, has been a resident of this District. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

29.    Defendant is a Pennsylvania corporation doing business at 1551 Wewatta St. Denver, CO 80202.

**HARM TO PLAINTIFF**

30.    If the website was accessible, Plaintiff could independently research and purchase Defendant's products.  She has attempted to access the website and has been unable to use the website as a result of material access barriers.  While she desires to access the website to assess Defendant's product offerings, prices and other information, she is deterred from continuing to attempt to use the website.

31.    Though Defendant purports to have centralized policies regarding the maintenance and operation of its website, Defendant has never had a plan or policy that is reasonably calculated to make its website accessible to, and independently usable by, individuals with vision related disabilities. As a result, the access barriers on the website are ongoing and likely to persist.

32.    The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.  Many other online retailers offer their goods and/or services through accessible websites.

33.    Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and in a manner that is compatible with screen reader technology.

**SUBSTANTIVE VIOLATION**
**Title III of the ADA, 42 U.S.C. § 12181 *et seq*.**

34.    The assertions contained in the previous paragraphs are incorporated by reference.

35.    Defendant's website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, *3 (W.D. Pa. Aug. 16, 2018) ("Simply put, Defendant in the instant case, like other corporate defendants in *Gniewkowski* and *Suchenko*, purportedly owns, operates, and/or controls the

11

property upon which the alleged discrimination has taken place—i.e., its website. Therefore, Plaintiff in this case has a nexus to the place of public accommodation and thus may claim the protections of Title III.").

36.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its website, it has violated the ADA.

37.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

38.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service or fails to provide a like experience to the disabled person.

39.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

40.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the

individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:   as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

41.    By failing to provide its website's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

    (a)    denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its website;

    (b)    affording individuals with visual disabilities access to its website that is not equal to, or effective as, that afforded others;

    (c)    utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

    (d)    denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

    (e)    failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

42.    Defendant has violated Title III by, without limitation, failing to make its website's services accessible by screen reader programs, thereby denying individuals with visual disabilities

the benefits of the website, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

43.    Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

44.    Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's website nor result in making the website different but enables individuals with visual disabilities to access the website Defendant already provides.

45.    Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

46.    Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

47.    Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

(A)    A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its website is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)      A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its website is accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law;

(C)      Payment of costs of suit;

(D)      Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment. *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11);

(E)      Whatever other relief the Court deems just, equitable and appropriate; and

(F)      An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: April 10, 2024                              Respectfully Submitted,

                                                  /s/ *R. Bruce Carlson*
                                                  R. Bruce Carlson (PA ID No. 56657)
                                                  Ian M. Brown (PA ID No. 201680)
                                                  **CARLSON BROWN**
                                                  222 Broad St.
                                                  PO Box 242
                                                  Sewickley, PA 15143
                                                  bcarlson@carlsonbrownlaw.com
                                                  ibrown@carlsonbrownlaw.com
                                                  (724) 730-1753

                                                  *Counsel for Plaintiff*